# EXHIBIT H

**Page 1**

```
         IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
   _____
                                :
   SHERILL GLICKMAN, et al.,     :
                                :
        Plaintiffs,              :
                                :
   v.                            :  Civil No. 1:05-cv-2046
                                :
   BAYER CORPORATION, et al.,    :
                                :
        Defendants.              :
   _____:

            Deposition of HAROLD BRUCE GLICKMAN, M.D.
                     Bethesda, Maryland
                  Friday, October 20, 2006
                         1:00 p.m.

   Job No: 1-87516
   Pages 1 - 80
   Reported by: Peggy L. Dingle
```

**Page 2**

Deposition of HAROLD BRUCE GLICKMAN, M.D. held at the law offices of:

FINKELSTEIN & HORVITZ, P.C.
7315 Wisconsin Avenue
Suite 400 East
Bethesda, Maryland 20814
(301) 951-8400

Pursuant to agreement, before Peggy L. Dingle, Notary Public of the State of Maryland.

**Page 3**

APPEARANCES

ON BEHALF OF PLAINTIFFS:
  NATHAN FINKELSTEIN, ESQUIRE
  Finkelstein & Horvitz, P.C.
  7315 Wisconsin Avenue
  Suite 400 East
  Bethesda, Maryland 20814
  (301) 951-8400

ON BEHALF OF DEFENDANTS:
  MICHAEL J. WASICKO, ESQUIRE
  Goodell, DeVries, Leech & Dann, LLP
  One South Street
  20th Floor
  Baltimore, Maryland 21202
  (410) 783-4036

**Page 4**

CONTENTS

EXAMINATION OF HAROLD BRUCE GLICKMAN, M.D.          PAGE
  By Mr. Wasicko                                       5


                EXHIBITS
          (Attached to the Transcript)
GLICKMAN DEPOSITION EXHIBIT                         PAGE
  1   Notice of Deposition                            5
  2   1997 PDR Cipro information                     39

Page 25

1  that drug?
2    A    Yes.
3    Q    Would you say that it's accurate for any given
4  patient that when you decide to prescribe a medication you
5  have weighed the risks versus the benefits of that drug
6  for that particular patient?
7    A    Yes.
8    Q    Has that always been your practice?
9    A    Yes.
10   Q    And that's pretty much a standard practice for
11 any --
12       MR. FINKELSTEIN: I am going to object. He is
13 not an expert in this case.
14       MR. WASICKO: Okay.
15       MR. FINKELSTEIN: To the extent you can,
16 answer.
17       MR. WASICKO: Okay. Let me -- let me ask the
18 question and then --
19 BY MR. WASICKO:
20   Q    Reviewing the -- or weighing the risks and the
21 benefits of a particular medication for a patient is more
22 or less standard practice for any prescribing health care

Page 26

1  professional, wouldn't you agree?
2        MR. FINKELSTEIN: Objection.
3  BY MR. WASICKO:
4    Q    You can answer.
5    A    Repeat the question.
6    Q    Sure. You said just a moment ago that it is
7  your practice to review the risks and the benefits of
8  prescription medication before you prescribe it to your
9  patient, correct?
10   A    Yes.
11   Q    And my question is is that more or less a
12 standard practice for what would be a reasonable
13 prescribing health care professional?
14       MR. FINKELSTEIN: Objection.
15       THE WITNESS: I -- I don't know. I can't
16 honestly answer for somebody else, but I would say that it
17 should be.
18 BY MR. WASICKO:
19   Q    Okay. And it is in your practice, correct?
20   A    In my practice, yes.
21   Q    Have you ever consulted the PDR for a
22 medication that was prescribed to your wife either by

Page 27

1  yourself or another health care professional?
2    A    No.
3    Q    Would that be because the drug that she was
4  being prescribed was known to you?
5    A    Could possibly be, yes.
6    Q    What are the other possibilities?
7    A    Such as?
8    Q    Of any -- I mean, you said that one possibility
9  you wouldn't have looked at a PDR for a prescription your
10 wife received is that you knew the -- you knew the drug
11 she received.
12   A    Right.
13   Q    That you said it was a possibility.
14   A    Right.
15   Q    And I am asking you what would other
16 possibilities be?
17   A    None.
18   Q    Okay. So you have not looked at the PDR for a
19 prescription that your wife was given either by you or
20 another health care professional because you knew of the
21 drug she was being prescribed?
22   A    Just about right, yes.

Page 28

1    Q    Okay. And that means that you understood the
2  indications and the contraindications for that drug,
3  correct?
4    A    Right.
5    Q    And you also understood the warnings and the
6  precautions for that drug, correct?
7    A    Right.
8    Q    Even though you may not have consulted a PDR
9  for a prescription that your wife was receiving, did you
10 ever discuss the various drugs that she has been
11 prescribed? I am sorry.
12       MR. FINKELSTEIN: Objection.
13       THE WITNESS: Repeat --
14 BY MR. WASICKO:
15   Q    Do you understand the question?
16   A    No.
17   Q    Would you have, in the course of the time you
18 have been with your wife, had a discussion with your wife
19 about any of the drugs that she may have been prescribed,
20 not necessarily in as in-depth as a PDR review but just
21 sort of discussing what a particular drug is being used
22 for and why?

**Page 37**

1  to do that, it would be partial, not -- not permanent,
2  and -- and that he would try -- was going to try not to do
3  that. That's the only thing I can recall.
4  BY MR. WASICKO:
5  Q   You don't recall any risks of the surgery
6  itself?
7      MR. FINKELSTEIN: Objection.
8      THE WITNESS: No, I don't.
9  BY MR. WASICKO:
10 Q   As a -- a medical professional and someone who
11 does surgery, what are the risks of -- of going under
12 general anesthesia for surgery?
13     MR. FINKELSTEIN: Objection.
14     THE WITNESS: Well, the -- the risk is like
15 Murphy's Law. Anything bad that can happen can happen.
16 So the -- that's the exact same words I use with my
17 patients. Does it happen? It can happen, but you have to
18 weigh your options.
19 BY MR. WASICKO:
20 Q   Sure. And what type of risks specifically
21 would you --
22     MR. FINKELSTEIN: Objection.

**Page 38**

1      THE WITNESS: You might not wake up from
2  anesthesia.
3  BY MR. WASICKO:
4  Q   So death is a -- a risk of -- of surgery?
5  A   I would think so. I think everybody realizes
6  that.
7  Q   But it's something that you discuss with your
8  patients nevertheless, correct?
9  A   Yes.
10 Q   You say you weren't present for that particular
11 discussion when Dr. Silva --
12 A   Right.
13 Q   -- may have -- may have had it with your wife,
14 correct?
15 A   Yes.
16 Q   Doctor, are you aware that Cipro has been
17 associated with tendon disorders or tendon injuries?
18 A   I am now.
19 Q   When did you become aware?
20 A   I think 2003.
21 Q   How did you become aware?
22 A   It began to be discussed at certain seminars

**Page 39**

1  and in the medical community and I can't remember which
2  seminars.
3  Q   Did you remember which lecturers may have
4  discussed it?
5  A   I -- that I can't remember, either. I am
6  sorry.
7  Q   So when you first became aware of tendon injury
8  of being associated with Cipro that would not have been a
9  seminar that would have been put on by Bayer; is that --
10 A   Correct.
11 Q   Did you know that Bayer had been warning about
12 the association with Cipro and tendon disorders or tendon
13 injuries since 1997?
14 A   No, I didn't.
15     MR. FINKELSTEIN: Objection.
16     THE WITNESS: I did not know that.
17     (Glickman Deposition Exhibit 2 was marked for
18 identification and was attached to the transcript.)
19 BY MR. WASICKO:
20 Q   Dr. Glickman, I want to show you what we have
21 marked as "Exhibit 2" for your deposition and I am going
22 to ask, if you would turn to the last page, if you

**Page 40**

1  recognize that as what is typically the front part of the
2  PDR, the Physicians' Desk Reference?
3  A   Yes.
4  Q   Okay. If you turn back to the beginning, this
5  is the 1997 PDR for -- for Cipro tablets. And on the
6  second page, it's on the third column a little bit above
7  where it says "Precautions," there is a paragraph that
8  starts "Achilles and other tendon." Do you see that?
9  A   Uh-huh.
10 Q   Okay. Could you read that for me?
11 A   "Achilles and other tendon ruptures that
12 required surgical repair resulting in prolonged disability
13 have been reported with Ciprofloxacin and other
14 quinolones. Ciprofloxacins should be discontinued if the
15 patient experiences pain, inflammation or rupture of a
16 tendon." Continue?
17 Q   No, that's fine. If you turn the page again,
18 in the third column there is a section entitled
19 "Postmarketing Adverse Events." Do you see that?
20 A   Uh-huh, yes.
21 Q   And they have listed a number of body -- body
22 areas. Going down to the fourth one from the bottom --

**41**

1    MR. FINKELSTEIN: I am sorry. Where are you?
2    MR. WASICKO: I am in "Postmarketing Adverse
3  Events" on the second page -- I am sorry -- third page,
4  third column.
5  BY MR. WASICKO:
6    Q   There is an area or a subheading called
7  "Musculoskeletal". Do you see that?
8    A   Uh-huh, yes.
9    Q   Okay. Do you see that tendonitis slash tendon
10 rupture is listed there?
11   A   Yes.
12   Q   Would you agree that then in 1997 Bayer was
13 warning medical professionals in the PDR about the
14 association or possible association with tendon disorders
15 and tendon rupture?
16   MR. FINKELSTEIN: Objection. He is really
17 asking you for an expert opinion. You have not been
18 designated in this case --
19   MR. WASICKO: I am not --
20   MR. FINKELSTEIN: -- to give an expert opinion.
21   MR. WASICKO: I am not asking for an expert
22 opinion. I am asking him for his opinion as a licensed

**42**

1  professional health care professional.
2    MR. FINKELSTEIN: Yes, he has -- he has not
3  been designated in this case as a licensed professional
4  and he is not -- unless you are interested in designating
5  him so and taking his deposition as an expert for which he
6  will be compensated, he should not be asked to answer
7  these questions. In fact, I am going to instruct him not
8  to answer. Don't answer that question.
9  BY MR. WASICKO:
10   Q   Let me ask it this way then. You agree that
11 this is the excerpt from the 1997 PDR, correct?
12   MR. FINKELSTEIN: Objection.
13   MR. WASICKO: He can answer that, can he not?
14   MR. FINKELSTEIN: No.
15   MR. WASICKO: Why can't you answer that
16 question?
17   MR. FINKELSTEIN: Well, if -- if he can tell
18 you whether this is the 1997 PDR, yes, that question --
19 this piece of paper that he's handed you, do you know
20 whether or not this is the 1997 PDR?
21   THE WITNESS: No.
22 BY MR. WASICKO:

**43**

1    Q   But you can look and you have already confirmed
2  that this is -- by looking at that back page that this
3  is --
4    A   The back page would be typical of a PDR.
5    Q   Very good.
6    A   Now, whether this comes from that PDR --
7    Q   You don't know?
8    A   -- that I can't corroborate.
9    Q   Okay. And I will represent to you that it is
10 from the 1997 PDR. And you have just read to us, for the
11 record, a warning about Achilles and other tendon
12 ruptures, correct?
13   A   Yes.
14   Q   And you had testified earlier that the PDR is
15 something that you refer to -- to determine warnings and
16 precautions for drugs, correct?
17   A   Correct.
18   Q   And Cipro is a drug that you have prescribed in
19 the past, correct?
20   A   Correct.
21   Q   And you say you had started prescribing it in
22 the early '80s -- I am sorry -- late '80s, early '90s,

**44**

1  correct?
2    MR. FINKELSTEIN: I am going to object.
3  What -- are we going to rehash all of his testimony? I
4  mean, the --
5    MR. WASICKO: No, that's -- that's the last
6  one. If I -- if I can't ask him the question that I
7  asked, this is what I am going to do.
8    MR. FINKELSTEIN: Well, he's already testified
9  and his testimony --
10   MR. WASICKO: Then --
11   MR. FINKELSTEIN: -- is on the record. Don't
12 ask him to rehash all -- don't rehash all the questions
13 that you have asked him before.
14 BY MR. WASICKO:
15   Q   And you can just answer yes or no to the last
16 question. Do you need it read back to you?
17   A   Yes.
18   MR. WASICKO: Could you read it back, please?
19   THE COURT REPORTER: Question: "And you say
20 you had started prescribing it in the early '80s -- I am
21 sorry -- late '80s, early '90s, correct?"
22   MR. FINKELSTEIN: Okay. I am going to object.